COTE (Case No. 3,267)

[6 Fed. Cas. page 614]

coming into another state, can claim only those privileges and immunities which belong to citizens of the latter state, in like circumstances. But the present case is like that of a state legislating in regard to its own citizens, and I can see no reason why it may not require security for good behavior from free persons of color, as well as from vagrants, and persons of ill-fame. The clause of the constitution which requires that warrants should be founded upon probable cause, supported by oath or affirmation, does not apply to the warrant in this case, which was for a debt due as a penalty for the violation of a by-law. But it is said that the charter does not apply to those free negroes and mulattoes who were residing in the city when the charter was granted. No law ought to be construed to have a retroactive effect unless the intention of the legislature be clear. The words of the charter, in this respect are equivocal. They are, "To prescribe the terms and conditions upon which free negroes and mulattoes may reside in the city." The word "prescribe" is prospective, and seems to imply that the rule is to be applied only to those who should come to reside in the city after the promulgation of the rule. It would seem to be unreasonable to suppose that congress intended to give the corporation the power to banish those free persons of color, who had been guilty of no crime, and who, by their residence had acquired a right to support under the poor-laws. Many such persons had been long residents of the city; some had been born there; had been useful members of society; had acquired property, and had contributed to the growth and improvement of the city, and had paid taxes for the support of the poor. They could not compel any white person to become their surety; and banishment would be the consequence of their inability to give the security required; unless they should submit to repeated imprisonments in the workhouse, and to the breaking up of their families, the ruin of their business, and the binding out of their children, by the guardians of the poor. If such had been the intention of congress they might have expressed it by using equivocal terms; as they have not, I feel myself bound, by the ordinary rules of construction, to say, that the charter only authorizes the corporation to prescribe the terms and conditions of residence for those persons of color who should come to reside in the city after the promulgation of such terms and conditions. In the present case the appellant was a resident of the city at the time of the charter, and has continued to reside there ever since, and therefore was not a person in regard to whose residence the corporation had, by the charter, a power to prescribe terms and conditions; and consequently was not liable to the penalty of the 7th section of the by-law. I am, therefore, of opinion that the judgment ought to be reversed with costs. Judgment reversed, with costs.

COSTS AND FEES. See Append. Fed. Cas.

COSTS AND FEES IN PRIZE CASES. See Append. Fed. Cas.

COSTS, FEES AND COMPENSATION IN PRIZE CASES. See Append. Fed Cas.

COSTS IN CIVIL CASES. See Append. Fed. Cas.

Case No. 3,267.

In re COTE.

[2 Lowell, 374;[1] 14 N. B. R. 503.]

District Court, D. Massachusetts. Dec. Term, 1874.

BANKRUPT—DISCHARGE—TRADESMAN.

1. The word "tradesman," in section 29 of the bankrupt law (Rev. St. § 5110), cannot fairly be held to mean trader, in the large sense of the old bankrupt law. Its meaning considered.

[Cited in Re Stickney, Case No. 13,439; In re Moss, Id. 9,877.]

2. A farmer, who occasionally bought and sold horses, cattle, and hay, was held not bound to keep books as a tradesman, within that section.

[Applied in Re Kimball, 7 Fed. 462.]

In bankruptcy. The bankrupt's discharge was opposed on the ground, that, being a tradesman, he had not kept proper books of account. The evidence tended to show that he was a farmer, and conducted his farm chiefly through his hired men; that several times in each year he visited Canada, and he then usually bought horses or cattle, and sometimes hay, partly for use on his farm and party for sale. His dealings in these articles were for cash. He was unable to write, and had never kept any books. There was no evidence that his failure was connected with his buying and selling. The amount of his dealings was a subject of some conflict of proof.

G. W. Morse, for objecting creditors.

N. B. Bryant, for bankrupt.

LOWELL, District Judge. I have more than once referred to the difficulty which I find in understanding what persons congress intended to include in the class of tradesmen. That this is not a fanciful objection may be seen by the remarks of the court in construing a statute of Pennsylvania, which exempted the necessary tools of a "tradesman" from seizure on execution, in Richie v. McCauley, 4 Pa. St. 472. "It is to be regretted," says Bell, J., in delivering the opinion in that case, "that, in framing a statutory provision of so much importance, a term so vague, and admitting of such variety of signification, should have been employed." He then goes on to say that in England the word is applied to small shopkeepers, but that in the United States it is rarely applied to persons engaged in buying and selling, but to mechanics and artificers of every kind, whose

[1] [Reported by Hon. John Lowell, LL. D., District Judge, and here reprinted by permission.]

livelihood depends upon the labor of their hands. Burrill, in his Law Dictionary, adopts this meaning, and gives this case as the authority. Bell, J., cites, too, the opinion in a case in Massachusetts, where the word is used in the same sense. Howard v. Williams, 2 Pick. 80, 83. In Webster's Dictionary the definitions are: 1. One who trades; a shopkeeper. 2. Any mechanic or artificer whose livelihood depends upon the labor of his hands (citing Burrill). 3. A handicraftsman in a borough (citing Scot.). In Wharton's Law Lexicon (English), the definition is "a shopkeeper."

The act of congress is taken in this part from the insolvent law of Massachusetts (Gen. St. c. 118, § 87); but I have not seen any reported case in which it is construed by the courts of the state. We may well regret that the bankrupt act of 1841 had not been followed, which imposed this duty on every merchant, banker, factor, broker, underwriter, or marine insurer. Persons coming within that description might be expected to keep books; but it will be difficult to find any modern definition or use of either "merchant" or "tradesman," which will include underwriters; so that the description probably omits some classes of persons who might well enough be included. Our present inquiry, however, is, whether it describes a person whom no one would expect to find subjected to such a duty, as, for instance, a handicraftsman. [This cannot be contended, because such people never keep books, and are not expected to keep them. It must refer to traders of some sort.][2]

It cannot be believed that congress really expected that a farmer, who sometimes incidentally, whether more or less often, bought and sold farm stock in addition to his own, and who would not be fitted by education to keep books, and who could not afford to have a clerk, should become an accountant. And yet if "tradesman" means "trader" in the largest sense, and if occasional trading makes a trader, no doubt this defendant was a tradesman.

I am of opinion that "tradesman" cannot fairly be stretched to mean "trader," in the large sense of the old bankrupt law. That law was, for some time, confined to persons who used the trade of merchandise, or sought their living by buying and selling. Among its earliest maxims was one, still important and binding in many respects, that it was to be taken largely and remedially for the benefit of creditors; and accordingly the class of persons subject to the law was continually extended by successive statutes and by decisions. Under these conditions, it was determined that any person might be brought within the act as a trader who bought and sold for gain, though his dealings might be on a very small scale compared with his means invested in other ways, or might be remote from his usual occupations. He would be a trader if he owned one share in a bank or trading company not incorporated. There is no such reason for giving a large meaning to the word "tradesman" in section 29 of the act of congress, and I do not think the word is ordinarily so used at present.

Nor am I prepared to admit that the word has a very different meaning in England and the United States. In both countries it is, I think, most often used as synonymous with "shopkeeper," and not seldom as a person who supplies your daily or occasional wants, such as a butcher or baker, or even a plumber or carpenter, whether he keeps a shop or not. But in both countries it has a signification much more restricted than that given to "trader" in the old bankrupt law; and I doubt if a dealer in horses and cattle has often been called a "tradesman" in either country.

The English statutes, for some forty or fifty years past, have put at rest the nice and perplexing questions about traders, by giving an alphabetical list of the occupations which should constitute trading, for the general purposes of those acts. But there is nowhere any such definition of "tradesman;" and the word has not become a technical one, excepting in some state statutes, such as have been already referred to, which are not in pari materia with the bankrupt law, and in which it is certain that the meaning is different from that intended here. The question, therefore, is addressed to the common usage of this country, and to the judge's knowledge of his own language. The word might, in many connections, be used in the sense of any man who trades; but I doubt if that is at the present time its usual signification, and whether it has that meaning in this section. The subject-matter proves that the act does not apply to handicraftsmen, or at least that there are many such to whom it cannot apply. The meaning of "tradesman" is, I think, substantially the same as "shopkeeper." "Merchant," in this connection, contrasts with "tradesman," as the greater with the less, and not vice versa.

The trading of this defendant is small enough in amount to bring him down below the grade of a merchant; and there remains a further question, whether congress intended that an occasional dealing by a farmer in farm products, other than those he has raised on his land, will make him a tradesman within this section, even if a person whose sole business should be to trade in such products, like what we call a grocer, or provision dealer, or cattle salesman would be. Here a distinction fairly arises out of the intent of this part of the statute, opposite to that which caused such an extension of the class of traders as general subjects of the bankrupt laws. It does not seem to me that congress intended to say that every one who ever bought and sold, under whatever circumstances, must

[2] [From 14 N. B. R. 503.]

·keep books of that part of his business; but that real merchants and actual tradesmen, being the class of persons whom the common practice of mankind makes bookkeepers, should keep their books properly; and that there may be persons who trade, such as peddlers, in a small way, but more especially persons like this defendant, who buy and sell merely by way of eking out their living, which is principally earned in other ways, that are not to be required to do this. Such a construction may leave the law a little uncertain; but it is, in my judgment, a sound construction, and the only one that will effect justice in the long run. In short, the distinction I take between this part of the law and that which made traders an extensive class, is, that the latter was remedial between debtors and creditors, and to be extended; and this imposes a duty on a certain class of persons, as such, and ought to be confined to those who actually belong to that class with some degree of permanence. [I conclude that this defendant was not such a tradesman as is bound to keep books.][2]

Discharge granted.

---

COTTINGHAM (UNITED STATES v.). See Case No. 14,872.

---

## Case No. 3,268.

### COTTLE v. PAYNE.

[Brunner, Col. Cas. 59;[1] 3 Day, 289.]

Circuit Court, D. Connecticut. Sept., 1808.

ACTION ON BOND—RIGHT, WHEN ACCRUES — PAYMENT — PRESUMPTION FROM LAPSE OF TIME — COSTS—WHEN TAXED AGAINST PLAINTIFF.

1. The condition of a bond being that the defendant should carry on the business of distilling cider brandy for seven years and three months, and keep an exact account of the quantity distilled and deliver to the plaintiff when demanded one tenth part thereof, and it appearing that the defendant did carry on said business, but kept no account and delivered nothing to the plaintiff; it was held that the plaintiff could have no right of action on the bond until the end of said term.

2. Payment of a bond will not be presumed from lapse of time alone within a shorter period than twenty years; but where the demand is a stale one, the plaintiff will be held to strict proof of the amount of damages which he is entitled to recover.

3. The court, in the exercise of their discretion, will not tax costs against a prevailing plaintiff, except where he must have known that he was not entitled to recover five hundred dollars.

This was an action of debt on bond dated the 17th of April, 1780, the condition of which was that [Stephen] Payne should carry on the business of distilling brandy from cider, and should continue to do so for seven years and three months from the date

of the bond, and should keep an exact account, during that term, of all brandy or other spirits distilled from cider by him, or on his account, or should deliver to [Grant] Cottle, when demanded, one tenth part of all such brandy or other spirits distilled from cider, free from expenses. The declaration averred that Payne did carry on the business for the term above specified, but kept no account and had delivered no brandy or other spirits. A special demand was alleged on the 20th of June, 1806. The action was commenced on the 10th of June, 1807. The defendant pleaded full payment. This plea was traversed and issue joined thereon.

The counsel for defendant stated that they should rely upon the lapse of time in support of the plea. By our statute of limitations no action can be sustained on any bond, bill, or note for the payment of money only, unless brought within seventeen years (St. Conn. tit. 101, c. 1, § 3); but as this bond was given for the performance of certain collateral acts, the statute does not attach upon it. The length of time in this case is such that payment is to be presumed at common law.

The counsel for plaintiff then introduced proof of the situation and circumstances of the parties to repel the presumption arising from lapse of time. It appeared that the plaintiff was a poor man; that soon after the execution of the bond he went out of the state, and was absent several years; that when he returned the defendant did not know him at first, though on hearing his name he recollected him. The defendant was a man of large property. A special demand was proved, as stated in the declaration. As to the amount of damages, it was proved that the defendant had carried on the business of distilling cider brandy for several years; but no specific quantity was proved to have been distilled except in one year. It was shown, on the other hand, that during some part of the period in question there was no cider to be had.

T. S. Williams and Mr. Trumbull, for plaintiff, contended: (1) That to raise the presumption that a bond has been paid, there must be a lapse of the full period of twenty years from its becoming forfeited, unless there be other circumstances which do not appear in this case. Colsell v. Budd, 1 Camp. 27. (2) That this bond did not become forfeited until the expiration of seven years and three months from the date; and from that time until the demand was less than nineteen years, and less than twenty years until the commencement of the action. (3) That the lapse of even twenty years affords only a presumption of payment that may be repelled, which in this case has been done by showing the plaintiff's absence from the state, and his inability, from that circumstance, and his poverty, to institute and carry on a suit. Very slight evidence is

---

[2] [From 14 N. B. R. 503.]

[1] [Reported by Albert Brunner, Esq., and here reprinted by permission.]